## Case No. 14,797.

UNITED STATES v. The CITY OF MEXICO.

[11 Blatchf. 489;[1] 1 Cent. Law J. 191.]

Circuit Court, E. D. New York. Feb. 19, 1874.[2]

SHIPPING — PENAL ACTION — EMPLOYING SEAMEN WITHOUT SIGNED ARTICLES—MEXICAN VOYAGES—STATUTES.

The 14th section of the act of June 7th, 1872 (17 Stat. 265), provides, that, "if any master, mate, or other officer of a ship, knowingly receives, or accepts to be entered on board of any merchant ship, any seaman who has been engaged or supplied contrary to the provisions of this act, the ship on board of which such seaman shall be found shall, for every such seaman," be liable to a penalty not exceeding $200. The 13th section of the same act provides, that every agreement with a seaman shall be signed by him in the presence of a shipping commissioner, and be acknowledged and certified under the hand and official seal of such commissioner. The 12th section of the same act provides, that the master of every ship bound from a port in the United States to a foreign port, shall make an agreement with every seaman of his crew, in a form prescribed by that section. By the act of January 15th, 1873 (17 Stat. 410), it is provided, that the 12th section of the said act of 1872 shall not apply to masters of vessels when engaged in trade with Mexico. The 1st section of the act of July 20th, 1790 (1 Stat. 131), provides, that the master of any vessel bound from a port in the United States to a foreign port, shall make an agreement in writing or in print, with every seaman on board, declaring the voyage or term of time for which such

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Affirming Case No. 2,756.]

seaman shall be shipped. *Held*, that the said act of 1873 had no effect to modify the provisions of the said 13th section of the act of 1872. and that. notwithstanding the said act of 1872, the master of a vessel making a voyage from New York to a port in Mexico was required. under the said act of 1790. to make the agreement therein required. and was also required to see that such agreement was signed. acknowledged, and certified before a shipping commissioner. in the manner prescribed by the said 13th section of the said act of 1872, and that such vessel was liable to the penalty provided by the said 14th section of the said act of 1872. if her master received a seaman on board who had been *engaged* otherwise than under an agreement so signed, acknowledged and certified.

[Appeal from the district court of the United States for the Eastern district of New York.

[This was a libel for a penalty against the steamship City of Mexico for a violation of the shipping act of June 7, 1872. The district court condemned the steamship in the sum of $200 and costs. Case No. 2,756. Claimants appeal.]

George W. Hoxie, Asst. Dist. Atty.
John E. Parsons. for claimants.

WOODRUFF. Circuit Judge. The libel in this case is founded on the provisions of the 14th section of the act of congress of June 7th, 1872, entitled. "An act to authorize the appointment of shipping commissioners by the several circuit courts of the United States, to superintend the shipping and discharge of seamen engaged in merchant ships belonging to the United States, and for the further protection of seamen." 17 Stat. 262, 265. That section imposes a penalty upon any ship, not exceeding two hundred dollars for each offence therein specified, and it separately specifies offences which shall subject the ship to penalty, by two distinct clauses: "First, if any person shall be carried to sea as one of the crew on board of any ship making a voyage as hereinbefore specified, without entering into an agreement with the master of said ship, in the form and manner, and at the place and times, hereby in such cases required, the ship shall be held liable, and for each such offence shall incur a penalty not exceeding two hundred dollars: provided, always, that the ship shall not be held liable for any person carried to sea," &c., &c. (describing certain cases of secretion on board without the knowledge of any officer of the ship, or false personation. &c.). "Secondly, if any master, mate, or other officer of a ship, knowingly receives, or accepts to be entered on board of any merchant ship, any seaman who has been engaged or supplied contrary to the provisions of this act, the ship on board of which such seaman shall be found shall, for every such seaman, be liable to and incur a penalty of a sum not exceeding two hundred dollars: provided, further, that, in case of desertion, or of casualty resulting in the loss of one or more seamen, the master may ship * * * and report the same to the United States

consul at the first port at which he shall arrive, without incurring such penalty." Here are described two separate penalties. in distinct clauses of the section, and, as will presently be seen, the inquiry why both were inserted is very important and significant. For, the cases mentioned therein do not, on their face, seem to differ. Looking at the description of the cases, without consulting any other provisions of this or other statutes or requirements of law, it may well be suggested. that no person can be carried to sea, as one of the crew with the knowledge of the officers of the ship. without being received, accepted, or entered on board; and, hence, the two clauses would seem to be tautological or repetitious, prescribing two penalties for the same violations of law, one for each offence. not exceeding two hundred dollars, and the other for every such seaman. not exceeding two hundred dollars. But. this declaration in these separate clauses will. I think. be found a significant and important aid to the construction of the statute. when *the facts of this case, the other provisions of* this statute and the former law. and the claims here made by the counsel for the parties. are more fully brought into view.

From as early as the year 1729, the statutes of England, for the protection of seamen as well as the security of ship owners, have required. under penalty, that no master bound to parts beyond seas shall carry any seaman or mariner to sea. without first coming to an agreement with such seaman or mariner for his wages, time of service and other particulars specified. which agreement shall be in writing, &c. (Act 2 Geo. II. c. 36, § 1), and providing expressly that the seaman shall sign such agreement (Id. § 2). By subsequent statutes, having the interest and protection of seamen constantly in view, the provisions of the act referred to have been enlarged and carried into greater detail, and, down to the present time, the policy and even the necessity of such agreements have been recognized. and this requirement kept in full force.

The subject very early engaged the attention of the congress of the United States, and. by the act of July 20th, 1790 (1 Stat. 131), it was enacted, that, from and after the first day of December then next, "every master or commander of any ship or vessel bound from a port in the United States to any foreign port, or of any ship or vessel of the burthen of fifty tons or upwards, bound from a port in one state to a port in any other than an adjoining state. shall. before he proceed on such voyage. make an agreement in writing or in print, with every seaman or mariner on board such ship or vessel, (except such as shall be apprentice or servant to himself or owners.) declaring the voyage or voyages. term or terms of time, for which such seaman or mariner shall be shipped. And. if any master or commander of such ship or vessel shall carry out any seaman or mari-

ner. (except apprentices or servants, as afore-said,) without such contract or agreement being first made and signed by the seamen and mariners, such master or commander shall pay to every such seaman or mariner the highest price or wages which shall have been given at the port or place where such seaman or mariner shall have been shipped, for a similar voyage, within three months next before the time of such shipping; provided such seaman or mariner shall perform such voyage; or, if not, then for such time as he shall continue to do duty on board such ship or vessel; and shall more-over forfeit twenty dollars for every such seaman or mariner, one-half to the use of the person prosecuting for the same, the oth-er half to the use of the United States; and such seaman or mariner, not having signed such contract, shall not be bound by the regulations, nor subject to the penalties and forfeitures, contained in this act." Other provisions follow, designed to secure both the seaman and the master or owners to the performance of their reciprocal duties. The act of April 14th, 1792 (1 Stat. 254), among other things, provides for the return of seamen, bound by agreement to serve, to their home, in certain cases, through the consuls of the United States. Other and subsequent acts exhibit the desire of congress to watch over and protect the interests of seamen.

In 1872, the act under which this proceeding was instituted was passed. It provides for the appointment of a shipping commissioner, and makes numerous and extensive provisions for carrying out the intention expressed in its title, above recited. Section 12 relates to ships bound from a port in the United States to a foreign port, or from a port on the Atlantic to a port on the Pacific, or vice versa; and provides that the master of every such ship "shall, before he proceeds on such voyage, make an agreement in writing or in print, with every seaman whom he carries to sea as one of the crew, in the manner hereinafter mentioned; and every such agreement shall be in the form, as near as may be, as hereunto in table 'D,' in the schedule annexed, and shall be dated at the time of the first signature thereof, and shall be signed by the master before any seaman signs the same, and shall contain the following particulars, that is to say:" Here follow numerous particulars, including all that were contained in the act of 1790, and very many which were not required by the law of 1790, or otherwise, in respect to other vessels than those in this section specified, and the form of agreement annexed, table D, contains many other specific details. Provisos to the section authorize the master to perform the duties of a shipping commissioner, as provided in a previous section, when in a port for which no shipping commissioner has been appointed; and, further, that this section should not apply to masters of vessels where the seamen are, by custom or agree-ment, entitled to participate in the profits or result of a cruise or voyage, nor to masters of coastwise nor to lake-going vessels that touch at foreign ports. It will thus be seen, that the duty of the master to enter into a written or printed agreement with the sea-man is continued; and that, as to ships bound on certain specified voyages, the agree-ment must contain the details specifically mentioned in this section, while the masters of other vessels not included in this section satisfy their duty by making an agreement in writing, signed by the seaman, containing what was prescribed in the former law. The masters of all ships described in the act of 1790 must make the agreement with the sea-man in writing or in print, some in the form prescribed by that act, others in the much more detailed form prescribed in this 12th section, but none are permitted to go to sea without a written or printed agreement with the seaman. Hereupon follows section 13, which declares that the following rules shall be observed with respect to agreements: "First. Every agreement, (except in such cases of agreements as are hereinafter specially provided for,) shall be signed by each seaman in the presence of a shipping commissioner. Secondly. When the crew is first engaged, the agreement shall be sign-ed in duplicate, and one part shall be re-tained by the shipping commissioner, and the other part shall contain a special place or form for the description and signatures of persons engaged subsequently to the first departure of the ship, and shall be delivered to the master. Thirdly. Every agreement entered into before the commissioner shall be acknowledged and certified under the hand and official seal of such commissioner, and shall be indorsed on, or annexed to, such agreement, * * *" and the form of ac-knowledgment and certificate is given. It is claimed, that the words, "every agreement," in the first clause of this 13th section, mean only those agreements which masters of cer-tain specified vessels named in the 12th sec-tion are, by that section, required to make. But, that is not the literal reading of the sec-tion. If that had been its intent, nothing was easier than to have so expressed it. Throughout the act, wherever it was intend-ed to limit a provision to the voyages de-scribed in the 12th section, the limitation is made in express terms. Sections 8, 22, 24, 35, 36, 40, 58, and others which are con-nected therewith in their provisions. Nor is there anything in the design and object of the law, which implies such a limitation. If there were no other provisions in the vari-ous sections of the statute, except such as relate to the particular vessels included in the 12th section, much plausibility would be given to the claim, but many of the sections, probably the greatest number of them, are general, referring alike to other seamen as well as to those named in the 12th section. Sections 9, 11, 23, 25, 26, 31, 32, 43–50, 51–

54, 61–63, and others. Section 15 is especially significant, and the special exception in section 13 of "agreements hereinafter specially provided for," greatly strengthens this interpretation. For, when, after the use of the terms "every agreement," congress declares certain agreements to be excepted, the presumption is against any other exceptions. Nor does the nature of the provisions in the 13th section indicate such an intent. The purpose of the act is fittingly declared, in its title, to be for the protection of seamen. They need protection against being compelled or seduced to sign agreements to serve, without properly understanding the provisions of the agreement, the term of service, the nature of the voyage or voyages, the compensation they are to receive, and the times of payment. They are frequently in danger of being approached and led into engagements when intoxicated. All this congress knew, and wisely provided that every agreement should be signed by them in the presence of the commissioner, and be duly acknowledged. Certainly, this court cannot say that this was not as important, in reference to the agreements which are required by the act of 1790, as to those specified in the 12th section.

The two clauses of the 14th section, above recited, apply to this construction of the 13th section with especial significance. The first clause refers to the crew of a ship "making a voyage as hereinbefore specified," i, e., making the voyages mentioned in the 12th section, and annexes the penalty to taking to sea without an agreement "in the form," &c., hereby, "in such cases," required. The form hereby required is prescribed in the 12th section, and is required only in the cases therein specified. The vessel here was not condemned under that clause. But, the second part of the section is more general. It refers, in terms, to the officers of "any merchant ship," and to "any seaman" who has been engaged or supplied contrary to the provisions of the act. There are several provisions relating to that subject, and, probably, none more important than the 13th section, which provides for their signing agreements to serve for a voyage, in the presence of the commissioner, and so guards them from imposition and deception therein, as the case may be, when they are in a condition wholly unfit to take care of themselves. Sailors are so often likened to children, in reference to the ease with which they can be deceived or influenced, and to their recklessness and inability to protect themselves, that the value of this provision needs no further illustration. Unless this second clause is to have such general scope and effect, extending beyond the 12th section, and to cases not within it, it is difficult to assign to it any useful meaning. The cases arising under the 12th section are provided for in the first clause. These considerations lead to the conclusion, that not only the agreements mentioned in the 12th section, but all other agreements with seamen, required by law to be in writing (though not included in the 12th section), must be signed by the seaman in the presence of the commissioner, or the penalty declared in the second clause of the 14th section is incurred by the ship.

To apply this conclusion to the case now under consideration: By an act of congress passed on the 15th of January, 1873. (17 Stat. 410), the act to authorize the appointment of shipping commissioners, now under consideration, was amended, by adding to the above mentioned 12th section a further proviso, namely: "Provided, further, that this section shall not apply to masters of vessels when engaged in trade between the United States and the British North American possessions, or the West India Islands, or the republic of Mexico." By this proviso the number or class of vessels whose master is required to make with seamen the written or printed agreement specified in that section is greatly reduced. The voyage of the steamship City of Mexico, for which seamen were shipped without their signing an agreement, as required in the 13th section of the said act, was, as proved on the trial of this cause, "from the port of New York, via Vera Cruz, and one or more ports in Mexico, and back to New York, with privilege of touching at any intermediate ports." This was a case within the proviso introduced by the amendment of 1873, so that section 12 of the act has no application thereto. So far as this voyage is concerned, the act and the amendment are to be read together, and the master of the City of Mexico was under no duty to make, with his seamen, an agreement, in the form and with the numerous details, of its contents and time of signing by the master, which the 12th section prescribes. But, applying to the case the conclusion herein above stated, the master was within the section which requires that every agreement shall be signed by the seaman in the presence of the shipping commissioner, unless it can be shown that he was under no legal obligation to make any written or printed agreement whatever with his seamen. That proposition cannot be maintained. Upon that point I concur fully in the reasoning of the judge of the district court. The effect of the amendment was to withdraw the voyage of the City of Mexico from the operation of the 12th section, and to leave it in the same condition, and subject to all the duties and obligations to which it would have been subject, if the 12th section of the act had been originally passed in its now amended form.

An actual intention, in the minds of the legislators, to withdraw a very large proportion of our seamen from the protection of written shipping articles, which it has been the intention and policy of England, for more than one hundred and fifty years, to pro-

vide, and which this country adopted in its earliest history, and has since consistently maintained, will not, I think, be, for a moment, contended. The argument is, that whatever we may suppose to have been in the mind of our legislators, we are bound by what is involved in the words and legal effect of their enactment. And thereupon it is claimed, that, when the terms of the 12th section of the act of 1872 were, as originally passed, made broad enough to embrace the voyage in question, that operated by implication as a repeal of the act of 1790, so far as relates to such voyages, and, hence, when, in 1873, congress withdrew such voyages from the operation of the 12th section, that act necessarily left such voyages wholly unprovided for by any existing law; and that, although it is possible to say that this legislation created a casus omissus, which the legislators did not probably, in their minds, contemplate, the court is, nevertheless, bound to construe statutes according to the meaning and legal effect disclosed by the statutes themselves, and not by any speculative inquiry into the actual intention of the legislators. This may be conceded, but, if it is claimed that the legislative intent may not be gathered from the nature of the subject, the consequences which would flow from a proposed construction, and the admitted policy of the government, the claim goes too far. Whenever the construction of statutes and their legal effect is doubtful, or susceptible of a double interpretation, these considerations are of great force, and often conclusive.

The act of 1790 (with some few exceptions) applied to the masters of all vessels. Section 12 of the act of 1872 selected some of those vessels, and applied to them its more stringent and particular provisions. From these latter provisions, the voyage now in question was, by the amendment of 1873, relieved. Now, I do not deem it very material to say whether the voyages to the West Indies were always under the operation of both statutes, and so, when relieved from the operation of the 12th section, were simply left under the influence of the statute of 1790; or, whether the 12th section operated as a technical or constructive repeal of the act of 1790, in respect to such voyages, but that the amendment operated to revive the act of 1790 thus constructively repealed. Either view works the same result. Repeals by construction are not favored. There was no repugnance or inconsistency between the requirements of the act of 1790 and the requirements of the 12th section of the act of 1873. To the requirements of the act of 1790 that 12th section added others, in special cases. When the voyage now in question was withdrawn from among those cases, it remained under the operation of the act of 1790, as fully as if the act of 1873 had not been passed.

It follows, that the City of Mexico incurred

the penalty declared in the second clause of the 14th section of the act of 1872, for which the decree was pronounced in the district court [Case No. 2,756]; and it must be so here decreed, with costs.